Good morning, Your Honors. May it please the Court, my name is Michael Scaraggi, Aransky-Scaraggi and Borg, to the appellants and cross-appellees. I would like to reserve five minutes for rebuttal. This case arises from an order that was issued by the International Brotherhood of Electrical Workers to Local Unions 675 and Local Unions 102. Local Union 675 was merged into Local Union 102. We're well aware of those facts. That merger took place in 1999. This is an order of the five counts, which were filed by the plaintiffs below on anti-cutback. Why was she wrong here? She was wrong, Your Honor, because the disputed amendment, which is the basis upon which this case was brought, particularly with respect to count one, was an amendment that was adopted in the welfare fund. It was not an amendment that was adopted in the pension fund. But it had a pretty profound effect on the pension fund. It did have an effect on the pension fund, the pension plan, Your Honor, that is correct. But there were other cases which were decided by the Second Circuit, Robinson versus Sheet Metal and Rombach versus Nessel, as well as a case that was decided by this circuit in Ray Lucent death benefit, where a welfare benefit, which was embedded in a pension fund, was subsequently terminated by a board of trustees or by the plan sponsor. And the court, and this court, ruled that it is the an ancillary benefit, as you identify a welfare benefit, is not a protected benefit  You could not have cut back in the pension fund, is that correct? No decrease of a pension benefit, that is correct, Your Honor. And that's a protected concept under the anti-cutback provision of 29 United States Code 1054. And the evidence shows that the trustees knew that. I'm sorry, Your Honor? The evidence shows that the trustees knew that. The trustees knew that they could not reduce a lump sum benefit or a periodic monthly benefit with respect to that benefit being paid by the pension fund. The trustees were also aware that, and these were the trustees of the welfare fund. Weren't they at the time the same trustees? Not entirely the same trustees. There was a commonality of trustees there. Very often with these half-partly funds, there is a commonality of trustees between the pension fund and the welfare fund. But they do meet on a separate basis, and they do meet separate issues, separate trust agreements, separate ID numbers, separate plan documents. Same officers, same administrators, same attorney? Yes, Your Honor. In this case, it was the same. There was a commonality with respect to those issues. That is correct. And our position is that the anti-cutback rule was not violated by the trustees of the welfare fund. The merger, when it took place, provided that the participants of the local 675 pension fund could receive a lump sum benefit up until the date of the merger. From the date of the merger forward, they could only receive a periodic monthly benefit, as was the case with the 102 participants, who never were able to receive a lump sum benefit. The 102 participants always were covered under the welfare fund, never had the opportunity to receive a lump sum benefit. The decision to adopt the disputed amendment was made to level the playing field, so that all participants who qualified on the basis of having earned 32 quarters of coverage under the welfare fund out of the 40 previous quarters of coverage, or 8 out of 10 years, would be eligible for lifetime health benefits from the welfare fund. That was the basis upon which the decision was made. Were the trustees aware of the fact that this would have an impact upon the pension? It's fair to say yes. But at the time of the merger, the merger of the pension fund of 675 into 102, the 102 pension fund accepted the underfunded liability of the 675 pension fund, which was approximately 22 percent, or around $20 million at that time. Mr. Scoraggi, doesn't the Supreme Court's decision in Central Labor's pension fund versus Hines make your job pretty difficult here? I mean, in that case, the Court was talking about a new condition. It said that at the moment a new condition is imposed, the accrued benefit becomes less valuable irrespective of any actual suspension. So if in that case the mere imposition of a condition was enough to constitute a cutback, how is the disputed amendment's conditioning of the receipt of the lump sum pension benefit on giving up health care benefits not violative of the anti-cutback? Well, the Hines case obviously dealt with the pension and a reduction in the pension benefit by a pension plan. This was the elimination of health care benefits by a welfare plan and never a reduction in the ability of the plaintiffs to receive the lump sum benefit. They had an opportunity to receive either the lump sum benefit or the periodic monthly benefit. The lump sum benefit was never restricted. The value of the lump sum benefit was decreased because if to receive a lump sum benefit, you must give up your medical benefits, which you were obtaining at no cost. The value of the lump sum benefit was decreased as a matter of common sense. Respectfully, I do not agree with Your Honor. I do not agree that the lump sum benefit was decreased. The lump sum benefit is specifically a pension benefit. In order to apply the anti-cutback rule, there are two parts that have to be brought into play. One is that the pension plan must be amended, and secondly, that the plan must be amended so that the benefit, which is an accrued benefit, is decreased. Do you deny an economic effect, as Judge Ferry's question implies? Yes, Your Honor. Respectfully, I deny that there would be any economic decrease in the benefit to these plaintiffs by virtue of the decision that was made by the pension fund. The same is true in the cases involving death benefits that were embedded in pension funds when the trustees eliminated those death benefits and the court identified those death benefits, which were originally identified as pension benefits, as ancillary welfare benefits, and the trustees do have the right, under the law, to modify plan benefits and eligibility rules. There was, in the welfare fund, a reservation of rights clause. The reservation of rights clause in the welfare plan did specifically give to the trustees, and it's cited in the brief, the authority to reduce, eliminate, and terminate benefits, including eligibility rules. So the trust... Eligibility rules for... Eligibility rules for the welfare fund. Oh, okay, but you're still dealing with the same fund. We're dealing with the welfare fund, not with the pension fund. Welfare fund specifically had a... The summary plan description for the IBEW 102 welfare plan had a specific reservation of rights section in it, which gave the trustees the authority to amend the plan, plan of benefits, including eligibility for benefits. For the welfare. For the welfare. Okay, but this affects something else. This affects the pension fund. It seems to me it's a constructive amendment of the pension fund. Well, with respect to the argument that, and it's cited in my opponent's, my adversary's brief, that you can't do indirectly what you can't do directly, there is no case law, I believe, which supports that equitable maximum with respect to the facts of this case. Well, you don't dispute that the anti-cutback provisions apply to a de facto or informal amendment. With respect to a pension plan. You could have a de facto informal amendment with respect to a pension plan, cannot have a de facto informal amendment to a welfare plan, which affects a pension plan. Didn't the district court at least implicitly find that the two, the provisions of the two plans were acting in concert? That was part of the finding of Judge Hochberg below. That is correct, Your Honor. And our argument is that she did not have to go beyond the plan documents. The plan documents were clear. The plan documents were unambiguous. And the plan documents contained, as I've stated, the reservation of rights clause in the welfare plan, giving the trustees the ability to make that change, that the plan document in the pension plan was never changed. The ability to receive a lump sum benefit was never taken away, was never reduced. It still continues in the pension plan, always continued in the pension plan. Good. Any other questions? No. Thank you very much. I'll have you back on rebuttal. Thank you. Mr. Bartkus. May it please the Court, my name is Robert Bartkus, B-A-R-T-K-U-S, of Dillon, Bataar & Luther in Marstown, New Jersey. We represent the plaintiffs below. I'd like to touch upon three things initially concerning the anti-cutback part of the case. The first are the facts. The second, the point that Judge Smith made, and that is the Hines case, which we could develop, if I understand Your Honor's position, understanding Ruth's side. And then the notion that you can have an indirect violation of the anti-cutback rule where you could not have a direct violation of the anti-cutback rule and the policy implications for that. This Court is presented with, I hate to use the word clear, but very clear record with respect to the intent and effect of this amendment. The stipulations, the testimony, and the Court's findings were extraordinarily clear. The Court called them compelling. Mr. Scroggie's statement to Mr. Bertoni, which was allowed in evidence without contradiction, was that Patsy DeLaCava, the administrator for the plans, had to do something to protect the pension plan. Everybody knows why this amendment was passed. What difference does the why have? I don't understand the import of motive or of the basis. The statute says what the statute says. The statute says that there shall not be made amendments to the plan that cut back on ERISA-protected benefits. So the question is, first of all, does that, should that be read strictly in the sense that there must be a formal amendment to the plan? We know that's not the case. Defendants admit that that's not the case. And the cases say that you do not need to make a formal amendment to the plan. There can be informal amendments. There can be, as in the Gillis case, transfers of power of the corporations, failure to fund the plans sufficiently that constitutes, as now Justice Alito said, a hypothetical amendment, a constructive amendment, even though you don't, quote, amend the plan. So we know that there can be indirect, informal, constructive amendments. The question is whether they have to be, quote, to the plan, or can they be in some other place? If your honors were to reverse the district court on that issue, we suggest that it would open up a world of mischief to get around the anti-cutback rule because people would do exactly what the union did in this case. They would all say, we know the law. We know what we can't do. We've been to the IRS. We know we can't do this in the pension plan. And maybe to be a little overly cute, they would simply change the hat they wore and move over to the welfare fund or to some other location and create the same effect as if they had amended the pension plan. Now this case is in fact extremely unique. It's a multi-employer plan where the evidence of the intent and the effect is extraordinarily clear. I don't perceive a parade of horribles from the district court's opinion. It is in fact the other way around. I have to apologize to the court for having omitted something in our briefs. And if I may, in the closing arguments, the summations after the trial, the district court asked Mr. Scroggie a hypothetical. I think it begins on 1240 or 1241 of the appendix. I had it marked. The hypothetical was what happens if everyone knows and intends when they're in that room in the welfare plan that if they did the same thing in the pension plan it would be illegal and we're doing it in the welfare plan to get around the problem and Mr. Scroggie said well that would be a problem because he had this theory that the district court said did not exist in evidence that there was some other reason for the amendment. Well let me come back to Judge Smith's question. Is motive or intent really matter in a case like this? And if it does, does the validity of the motive matter? That is I gather that the union claimed that the financial necessity forced them to take this action. Isn't your position stronger if you don't deal with motive or intent? The statute says that pension plans are protected, can't cut back and if there's a constructive or indirect amendment that is the equivalent of a direct amendment then you should win. I love that reasoning, Your Honor. I look at the case as narrowly as possible to decide this case and not all other cases. This case is one where the evidence of intent and effect was absolutely crystal clear. We don't have to decide all the other cases. I might be able to hypothesize other instances where there was no sense when a welfare plan or an employer made a change to some benefit not protected in the same way that pension plan benefits are protected. And someone could say, gee whiz, that affects my pension plan rights. I don't think I would want to fight that case today. The case today is where the evidence is so clear because it's the clear instance of trying to get around congressional intent, getting around the benefits that were promised to these plaintiffs. We don't have to decide all the other cases. In that regard, Your Honor, the district court at the end said that if the change touches on the pension plan, I think this is the last paragraph of the opinion. I would not go that far because we don't have to go that far to win this case and to have the district court's opinion affirmed. Does that answer the question? The factual findings go beyond the intent and effect of the amendment in two other ways that are interesting, maybe for the other counts which don't need to be decided if you affirm on the anti-cutback count. The first, I should say the second factual issue, and Mr. Scroggie raised it, is the extent to which there were other reasons for the disputed amendment. He said today and he said many, many times before that the intent was to level the playing field. Everybody knows the only playing field that was being leveled was the pension plan playing field between those members of former Local 675 and members of Local 102 who did not have the same benefit. The court made findings based on clear evidence, actually the lack of evidence, that the rationale given as to any welfare plan were pretext. There was no evidence of any documents, no clear testimony, there was no evidence at all of that. So again, the notion that we did this level the playing field for people in the welfare plan has no evidence in it. The third factual issue, and I don't think it's relevant to the anti-cutback issue, is this is the one case that I've seen contrasted to the others where we have clear testimony, but I don't think this is a finding by the district court, of how a collective bargaining agreement in a multi-employer plan works, at least it worked in this case, and that is the testimony from the plaintiffs was that the union and the employers, the group of employers, get together and negotiate the gross amount of pay. The union then, its representatives, the plaintiffs as it were, decide how much of that pay shall be devoted to, how much of that gross compensation shall be devoted to pay, how much shall be devoted to health benefits, and how much shall be devoted to pension benefits or any other benefits. That makes this particular plan, this arrangement, different from the typical employer settlor discussions in other cases, whether you're talking about Section 510 or a fiduciary duty claim. Because here it is the employees who have decided how much money, in essence their money, to put into that welfare pot, how much money to put into the pension pot. And that's a very different legal structure than if an employer says, I am going to, out of my largesse, for whatever good reasons the employer may have, allocate so much to pay, so much to health, and so much to pension. Because here the employees have chosen how much money to put in. And although this Court does not need to get into it at all if you affirm on the anti-cutback rule, it does affect the fiduciary duty claim and the distinction that the cases make between trustees acting in a fiduciary capacity as opposed to a settlor capacity. Because if you're doing a sham amendment, as here, as described in the Spinks case in the Supreme Court, or sham transactions, the word that the Supreme Court used in that case, to make believe you're acting as a settlor, when in fact you're acting in a much more fiduciary capacity. Your Honor, if you have any other questions, I'd be happy to reach them. I see my time is almost up. Your Honor, I believe Judge Smith may have asked the question about his motivation, the reasoning behind why the amendment was adopted, relevant. And motivation is not relevant. The basis upon which, to determine a basis upon which the amendment was adopted. Motivation is not relevant. We talked about leveling the playing field. The playing field was always level in the pension fund. The participants of Local 675 could always receive either a lump sum or periodic monthly benefit. They still can receive either a periodic monthly benefit or a lump sum, up to the date of the merger, which was 1999. The playing field was not level in the welfare fund. The playing field was not level in the welfare fund because the 102 participants never had the opportunity to receive a lump sum. And incidentally, a participant could receive a lump sum benefit from the pension fund, be eligible for continued lifetime benefits from the welfare fund for having satisfied the requirement of 32 quarters out of 40 quarters or 8 years out of the previous 10 years, and then be able to go back to work the next day or the next week and have already enjoyed the benefit of receiving the total lump sum from the pension fund. Not true for a 102 participant who could only receive a periodic monthly benefit, and once they earned or went back to employment, their monthly benefit would be suspended. Once they worked at least 41 hours a month or more, their monthly benefits would be suspended. So that was one of the purposes of adopting that amendment, although I've said the motivation for the amendment is not relevant. But there is a clear distinction between the pension fund and the welfare fund. Judge Hochberg, in her opinion, talked about how this benefit was going to be cut back because fewer people were going to choose the lump sum benefit because of the restriction of lifetime health benefits. The fact that fewer people were going to receive the benefit is not a decrease in an accrued benefit. Why would fewer people then not choose it? Fewer people would have chosen the lump sum benefit because they didn't want to lose their continued health care benefits. That was a known fact. Sure. That was an absolute known fact. Then the value of the lump sum benefit is decreased. The value of the lump sum benefit in terms of a pension benefit was never decreased. The argument could be made, was it restricted to a smaller group of people? And the argument could be, yes, that it was restricted to a smaller group of people who could receive the lump sum benefit. No prohibition against restricting it against one group of people as opposed to another group of people. Mr. Scaraggi, with all due respect, your response to Judge Barry suggests to me that what you're saying is this isn't an economic decision. And that is just patently not the case. There was an economic facet to this decision, there's no question about it, because of the fact that this now 800- or 600-pound gorilla is now sitting in a room, not only with the welfare fund trustees but also with the pension fund trustees. Everybody was aware of the fact that there was a huge unfunded liability that was carried over from 675 to 102. The disputed amendment required the decision-maker, i.e., the incoming 675 member, to make a decision which inherently involved economic tradeoff, didn't it? Yes. Yes. But not a decrease in that pension benefit, not a decrease in the lump sum. It was an actuarial equivalent between the lump sum benefit and the periodic monthly benefit. There's a distinction, as I've already noted, between that pension fund and the welfare fund. The motivation for the amendment is not relevant. Our position is that the lump sum benefit was not decreased. The trustees, in adopting the amendment in the welfare fund, did not violate the anti-cutback provisions of ERISA. The participants of 675 who chose a lump sum benefit still had the opportunity to receive the full value of the lump sum benefit without continued health insurance if they so qualify, because that was a pension benefit. I'm sorry, it was identified as a welfare benefit, as was the death benefit in Lucent, as was the death benefit in Rombach, as was the death benefit in Williams v. The Sheet Metal Workers, wherein the court, that was a Second Circuit decision, wherein the sponsor eliminated the ability to receive an industry-related disability benefit to people who earned more than $35,000 a year. They were eliminated from eligibility to receive the industry-related disability benefit, which the court identified, even though it was embedded in the pension plan, as a welfare benefit. The right to continued health insurance is a welfare benefit. Trustees had a right to amend the plan, Curtis Wright, Schoonhagen. Our position is that the trustees did have the right, under Curtis Wright, Schoonhagen, to amend the plan. There was the reservation of rights clause. They exercised it, and they didn't violate the anti-cutback rule. With respect to anti-interference, which Mr. Barkas referred to, requires an employer-employee relationship, and I think the case is a replete here in the Third Circuit with regard to that relationship. Thank you, Your Honor. Any further questions? Mr. Scaratti, thank you very much. Thank you, Judge. The case was very well argued by both sides. We will take this matter under advisement.